IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:24-CV-221-M

TIMOTHY RYAN STARNES,

    Plaintiff/Claimant,

v.

LELAND DUDEK,
*Acting Commissioner of Social Security*,

    Defendant.

MEMORANDUM AND
RECOMMENDATION

This matter is before the court on the parties' briefs filed pursuant to the Supplemental Rules for Social Security Actions. [DE-11, -14]. Claimant Timothy Starnes ("Claimant") filed this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking judicial review of the denial of his application for Supplemental Security Income ("SSI") payments. Claimant filed a reply to the Commissioner's brief, [DE-15], the time for filing responsive briefs has expired, and the matter is ripe for adjudication. Having carefully reviewed the administrative record and the briefs submitted by the parties, it is recommended that the case be remanded to the Commissioner for further consideration.

## I. STATEMENT OF THE CASE

Claimant protectively filed an application for SSI payments on May 6, 2021, alleging disability beginning April 1, 2019. (R. 17, 202–16). His claim was denied initially and upon reconsideration, (R. 88–110), at which point Claimant requested a hearing before an Administrative Law Judge ("ALJ"). The hearing was held on July 12, 2023, and Claimant,

represented by counsel; Dr. Lesley Graham, a psychologist; and a vocational expert ("VE") appeared and testified. (R. 35–62). On September 19, 2023, the ALJ issued a decision denying Claimant's request for benefits. (R. 14–34). After the Appeals Council denied Claimant's request for review, (R. 1–6), he then filed a complaint in this court seeking review of the now-final administrative decision.

## II. STANDARD OF REVIEW

The scope of judicial review of a final agency decision regarding disability benefits under the Social Security Act ("Act"), 42 U.S.C. § 301 *et seq.*, is limited to determining whether substantial evidence supports the Commissioner's factual findings and whether the decision was reached through the application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). While substantial evidence is not a "large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988), it is "more than a mere scintilla . . . and somewhat less than a preponderance." *Laws*, 368 F.2d at 642. "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996), *superseded by regulation on other grounds*, 20 C.F.R. § 416.927(d)(2)). Rather, in conducting the "substantial evidence" inquiry, the court's review is limited to whether the ALJ analyzed the relevant evidence and sufficiently explained his or her findings and rationale in crediting the evidence. *Sterling Smokeless Coal Co. v. Akers*, 131 F.3d

2

438, 439–40 (4th Cir. 1997).

## III. DISABILITY EVALUATION PROCESS

The disability determination is based on a five-step sequential evaluation process as set forth in 20 C.F.R. § 416.920, under which the ALJ is to evaluate a claim:

> The claimant (1) must not be engaged in "substantial gainful activity," i.e., currently working; and (2) must have a "severe" impairment that (3) meets or exceeds [in severity] the "listings" of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform . . . past work or (5) any other work.

*Albright v. Comm'r of the SSA*, 174 F.3d 473, 475 n.2 (4th Cir. 1999). "If an applicant's claim fails at any step of the process, the ALJ need not advance to the subsequent steps." *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995) (citation omitted). The burden of proof and production during the first four steps of the inquiry rests on the claimant. *Id.* At the fifth step, the burden shifts to the ALJ to show that other work exists in the national economy which the claimant can perform. *Id.*

When assessing the severity of mental impairments, the ALJ must do so in accordance with the "special technique" described in 20 C.F.R. § 416.920a(b)–(c). This regulatory scheme identifies four broad functional areas in which the ALJ rates the degree of functional limitation resulting from a claimant's mental impairment(s): activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. *Id.* § 416.920a(c)(3). The ALJ is required to incorporate into his written decision pertinent findings and conclusions based on the "special technique." *Id.* § 416.920(e)(4).

## IV. ALJ'S FINDINGS

Applying the above-described sequential evaluation process, the ALJ found Claimant "not disabled" as defined in the Act. At step one, the ALJ found Claimant had not engaged in

3

substantial gainful activity since the application date. (R. 20). Next, the ALJ determined Claimant had the severe impairments of intellectual disorder, anxiety disorder, depression, post-traumatic stress disorder ("PTSD"), obesity, and diabetes, and the non-severe impairments of degenerative disc disease and acrochordon. *Id.* At step three, the ALJ concluded Claimant's impairments were not severe enough, either individually or in combination, to meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 20–22). Applying the technique prescribed by the regulations, the ALJ found that Claimant's mental impairments have resulted in moderate limitations in understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. (R. 21). Prior to proceeding to step four, the ALJ assessed Claimant's residual functional capacity ("RFC"), finding that he had the ability to perform medium work[1] with the following restrictions:

> [H]e can lift and/or carry 50 pounds occasionally, 25 pounds frequently. He can stand and/or walk, with normal breaks, for a total of 6 hours per 8-hour workday, and can sit, with normal breaks, for a total of 6 hours per 8-hour workday. In terms of postural limitations, he can never climb ladders, ropes, or scaffolds, can occasionally climb ramps and stairs, stoop, kneel, crawl, and crouch, and he can occasionally balance, although in regards to balancing, he must avoid narrow, slippery surfaces. There are no manipulative, visual, or communicative limitations. In terms of environmental limitations, he must avoid unprotected heights, moving mechanical parts, and more than occasional exposure to extreme heat or extreme cold. In terms of mental limitations, he would be able to understand, remember, and carry out simple, routine instructions, consistent with SVP 1 and 2 jobs, consistent with a reasoning level of 1, and consistent with a language level of 1. He could work in a low stress environment, defined as involving simple, work-related decisions; involving no assembly line work; and having only occasional changes in the work setting. He can tolerate occasional, superficial interaction with the public, and occasional, direct interaction with coworkers and supervisors.

---

[1] Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying objects weighing up to 25 pounds. If someone can do medium work, they can also do sedentary and light work. 20 C.F.R. § 416.967(c).

4

(R. 22–28). In making this assessment, the ALJ found Claimant's statements concerning the intensity, persistence and limiting effects of his symptoms to be not entirely consistent with the medical evidence and other evidence in the record (R. 23). At step four, the ALJ concluded Claimant has no past relevant work. (R. 28). At step five, upon considering Claimant's age, education, work experience and RFC, the ALJ determined there are jobs that exist in significant numbers in the national economy that he can perform. (R. 28–29).

## V. DISCUSSION

Claimant argues that the ALJ erred by failing to adequately account for his moderate limitations in adapting or managing oneself and properly consider his subjective complaints when formulating the RFC. Pl.'s Br. [DE-11] at 5–13. The Commissioner counters that substantial evidence supports the ALJ's determination that Claimant has the RFC to perform a modified range of medium work. Def.'s Br. [DE-14] at 7–19. After reviewing the parties' briefs and the evidence in the record, the undersigned agrees with Claimant that the ALJ improperly considered his subjective statements. As a result, the ALJ's assessment of Claimant's adaptation and self-management limitations is also tainted.

An individual's RFC is the capacity an individual possesses despite the limitations caused by physical or mental impairments. 20 C.F.R. § 416.945(a)(1). "[T]he residual functional capacity 'assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions' listed in the regulations." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting S.S.R. 96-8p). The ALJ must provide "a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* (quoting SSR 96-8p); *see also Clifford v. Apfel*, 227 F.3d

5

863, 872 (7th Cir. 2000) (observing that the ALJ "must build an accurate and logical bridge from the evidence to his conclusion").

In the instant case, when the ALJ assessed Claimant's RFC, he detailed the following non-exertional limitations:

> [H]e would be able to understand, remember, and carry out simple, routine instructions, consistent with SVP 1 and 2 jobs, consistent with a reasoning level of 1, and consistent with a language level of 1. He could work in a low stress environment, defined as involving simple, work-related decisions; involving no assembly line work; and having only occasional changes in the work setting. He can tolerate occasional, superficial interaction with the public, and occasional, direct interaction with coworkers and supervisors.

(R. 26).

As part of the RFC evaluation, the ALJ, *inter alia*, summarized Claimant's hearing testimony relating to his mental health impairments. (R. 23). Specifically, the ALJ stated,

> He reports that, dealing with PTSD and anxiety disorder, it is hard to make it through work. When his anxiety is triggered, he has physical pain and symptoms that increase his anxiety even more, making it hard to calm himself. He takes medication but still has daily difficulties. Ex. B4E/1. He reports difficulty talking, hearing, seeing, remembering, completing tasks, concentrating, understanding, following instructions, and getting along with others. Ex. B4E/6. He reports that his paranoia has increased and he does not leave home often. Ex. B6E/4. At the hearing, the claimant's testimony described primarily mental symptoms and limitations, generally consistent with the above allegations. For example, he testified that he does not leave his apartment unless absolutely necessary. He has a history of special education and learning disability, and did not get a regular diploma. He has problems with reading and math. He has gone to Vocational Rehabilitation and done some sheltered work. He was told he worked too slowly. He had problems working due to depression and anxiety. He had problems interacting with new people. He has anxiety when he does not understand something or does something wrong. It becomes hard to focus and concentrate. He becomes overwhelmed, sad, and discouraged.

*Id.* However, the ALJ found Claimant's subjective complaints alleging limitations beyond those described in the RFC were not consistent with the record as a whole. *Id.* Instead, according to the ALJ, "the evidence of record shows that [Claimant's] level of functioning is not as fully limiting

6

as alleged and that the objective medical findings are not generally consistent with the degree of impairment alleged." (R. 23–24). The ALJ summarized the relevant mental-health-related medical evidence as follows:

> [Claimant's] mental symptoms . . . have improved with treatment. For example, in June 2021, the claimant was noted to have made progress toward his goals. He had maintained his apartment and was engaging with others via online gaming communities. He reported low anxiety levels and a reduced amount of panic attacks. He had struggled to find employment due to COVID-19 impacts. Ex. B11F/26.
>
> Subsequently, the claimant continued to make progress toward his treatment goals. Ex. B11F/30, 34, 38, 42-43; B13F/13. His depression, anxiety, and PTSD were typically noted to be stable. Ex. B11F/51-52; B13F/28-29. By October 2022, he was noted to have been very successful over the last six months in Community Support team services and was ready for a lower level of care. He had not had any hospitalizations in the past year, was compliant with medications, paid his rent on time, and managed his daily needs. Ex. B13F/7.
>
> Mental status exams have been routinely unremarkable, showing the claimant to present with normal appearance, mood, affect, behavior, language, thought process, associations, speech, thought content, perception, fund of knowledge, orientation, concentration, memory, insight, judgment, and functional status. Ex. B11F/49-50, 54, 59, 64, 68-69, 73-74; B13F/13-14, 26, 30.

(R. 24–25).

The ALJ's description of the record evidence is not entirely incorrect; there is reason to believe that Claimant's anxiety and panic attacks have gradually improved over time, particularly since Claimant was able to procure housing. To begin with, Claimant has received community support services from Carolina Outreach since at least 2018. (R. 305–12, 533–639, 651–853, 944–1016). As the Commissioner argues, from 2021 onward, treatment notes reflect that while some level of baseline anxiety and day-to-day stress remains in Claimant's life, there have been marked improvements in Claimant's overall anxiety levels, the frequency of his panic attacks, and his attitude towards working. *See, e.g.*, (R. 570) (Claimant describes his anxiety as "pretty

7

good, stays down, nothing to be anxious about" and expresses that his mood will be better once he receives his second coronavirus vaccine and can get out more); (R. 669) ("Anxiety stable. Takes Hydroxyzine once daily, mid afternoon, especially looking at the news."); (R. 683) ("Anxiety 'up and down, spikes,' manageable with med and coping."); (R. 730) ("[Claimant] has worked on identifying triggers for anxiety and panic attacks and has reported a significant decrease in anxiety."); (R. 743) ("I have had anxiety, its manageable."); (R. 987) ("My next goal is to find a job because I'm worried about disability not going through and not being able to live without money. It's really stressing me out."); (R. 996) ("Client and CST staff reviewed how client is feeling about his upcoming stepdown and how well client has been doing the last few months."); (R. 1001) ("Client still really wants to try to find ways to stay busy during the day but needs more motivation. Client still wants to wait on his SSI decision before working."). In fact, by the second half of 2022, Claimant had progressed far enough in his mental health treatment plan that he stepped down to a lower level of care that better suited his goals. *See, e.g.*, (R. 950) ("Tim has been very successful over the last 6 months in CST and is ready for a lower level of care. Tim has not had any hospitalizations in the past year, is medication compliant, pays his rent on time, and manages his daily needs."); (R. 971) ("[Claimant] was stepped down from CST, going good with OPT."). This overall positive trend appears to have continued into 2023, with the available treatment notes reflecting that Claimant has stressful days, but he is able to manage them using learned coping skills and his prescribed medication. (R. 981).

In addition to the treatment notes from Carolina Outreach, the record also contains the results of many mental status examinations which, as the ALJ described in his assessment, were "routinely unremarkable," (R. 25). *See* (R. 306–07, 310–11, 535–36, 539–40, 543–44, 547–48, 551–52, 559–60, 563–64, 568, 572–73, 585–86, 589–90, 604–05, 661–62, 666–67, 671–72, 680–

8

Case 5:24-cv-00221-M-RJ    Document 17    Filed 04/07/25    Page 8 of 16

81, 685–686, 690–91, 704–05, 741–42, 746, 751, 755–56, 760–61, 765–66, 770–71, 774, 778–79, 781–82, 785–86, 789–90, 797–98, 793–94, 801–02, 805–06, 809–10, 813–14, 817–18, 821–22, 825–26, 832, 835–36, 845–46, 956–57, 969, 973). At Claimant's most recent assessments, he was typically well-groomed, with good eye contact; his mood was euthymic; his affect was stable and appropriate given the circumstances; his behavior was usually cooperative, and he tended to be easily engaged; his language was appropriate for his age and education level; his thought processes were coherent, logical, and goal-directed; his fund of knowledge was appropriate for his age and education; he was able to concentrate adequately, and his recent and remote memory was intact; his judgement was intact; and his insight was good and, at times, even excellent. *Id.* Furthermore, at no point during the course of treatment did Claimant's providers ever determine that he was unable to complete daily living skills appropriate to his age and developmental level. *See id.*

Critically, though, despite the presence of the above-listed evidence suggesting that Claimant's mental health symptoms have improved, the ALJ's RFC assessment suffers from a fatal flaw. Namely, the assessed RFC is the product of cherrypicking, and the cherrypicking that occurred throughout the assessment process is especially pronounced when considered in light of Claimant's subjective complaints about his mental-health-related symptoms. To briefly summarize Claimant's subjective statements, at the (telephonic) hearing before the ALJ, Claimant testified that he does not leave his apartment unless it is "absolutely necessary." *See* (R. 43). After additional questioning, Claimant explained that while he may occasionally go out to eat at a restaurant when invited by other people, otherwise "[m]ost of the time people come to visit [him]." *Id.* He has anxiety interacting with new people, most medical appointments he attends are held virtually, and his mental health care team has helped him set up online bill

9

payment so that the "only thing [he has] to actually leave [his] apartment for [is] to get a money order for [his] rent." (R. 43, 48, 53). Claimant explained that much of his anxiety around leaving the house stems from the fact that he is "very at risk for covid"; even though "people [are] moving on [from it], [ ] in [his] head, it's very much a threat." (R. 52).

Notably, Claimant's treating psychologist, Dr. Lesley Graham (who also testified telephonically at the hearing, from Claimant's home), verified Claimant's statements about not leaving his apartment and provided additional context for his testimony, which is especially helpful because many of Claimant's hearing statements are difficult to understand. Specifically, Dr. Graham explained that Claimant "doesn't go out more than maybe three or four times a month because it—a lot of different things outside are triggers." (R. 56). Dr. Graham further clarified that Claimant can be "triggered by something that happens or if he goes out . . . it could be a smell, it could be a sound. It could be a person or an experience or an event that can just create very severe anxiety . . . ." (R. 54–55). The fear of catching the coronavirus is presumably one of those triggers.

Claimant's subjective statements that he does not leave his home much due to anxiety— and Dr. Graham's corroborating testimony—are also supported by the record. While, as discussed *supra*, Claimant's Carolina Outreach treatment notes from 2021 and on illustrate some level of symptom improvement and an increase in Claimant's willingness to work, they also show that many of Claimant's mental health appointments still take place virtually, that most of Claimant's socializing occurs virtually, and that he continues to experience anxiety when leaving his home, either because of coronavirus concerns or other triggers. *See* (R. 533, 566, 570, 659, 664, 669, 738, 743, 971) (flagged as virtual appointments); (R. 533, 577, 580, 651, 659, 664, 669, 986) (describing Claimant's online gaming and connections he has made virtually); (R. 566)

10

(Claimant is "'[t]rying to walk 30 minutes a day inside, lots of kids in school nearby, fears contracting COVID.'"); (R. 580) ("Tim reports wanting to address reengagement in the community and addressing social anxiety that client expects to experience as interactions with others increase."); (R. 651) ("Tim has reported an increase in anxiety as he begins to go out in the community more often and reports being worried about feeling socially anxious in the future."); (R. 659) ("'There is always anxiety.' He reports taking Hydroxyzine once a day, 'there are days I like going out with Mom. We have been helping each other, I limit it to 2 hours a day.'"); (R. 664) ("Hopefully I will get out more in the new year and the booster."); (R. 669) ("Feels a little isolated, out 2x/week."); (R. 674) ("Tim reports he continues to experience anxiety when unforeseen triggers or stressors arise and wants to learn how to more quickly regulate his emotions."); (R. 730) ("He continues to struggle to identify new hobbies and has not engaged in community activities due to COVID."); (R. 734) (report from August 2022 stating that "Tim continues to isolate due to his concerns about COVID exposure . . . . Staff and client are working on helping client to feel comfortable outside of the home in preparation for working again."); (R. 738) ("Anxiety when he goes out or if something is bugging me anxiety picks up."). Additionally, several of the mental status examinations the ALJ referred to in his report as "routinely unremarkable" occurred virtually, i.e., without requiring Claimant to leave his apartment and trigger his anxiety. (R.535, 551, 555, 560, 564, 572, 672, 686, 741, 746, 751, 756, 760, 765, 770, 778, 782, 785, 789, 969).

The ALJ's failure to fully consider the above information is error because to the extent that Claimant's medical records indicate that his anxiety and panic attacks have improved, this is largely because Claimant rarely leaves his house. Presumably, Claimant would still experience anxiety and panic attacks if he were to regularly venture outside of his apartment and encounter

11

new people and new experiences, i.e., new "triggers." *See* (R. 54–56). The ALJ's decision does not account for this limitation, however, and instead cherrypicks the record by implying that Claimant's anxiety and panic attacks have improved to such a point that Claimant is now able to regularly interact with the outside world. *See Lewis v. Berryhill*, 858 F.3d 858, 869 (4th Cir. 2017) ("An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherrypick facts that support a finding of no disability while ignoring evidence that points to a disability finding.") (quoting *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010)); *Lockerby v. Saul*, No. 1:19-cv-00159-MOC, 2020 WL 506752, at *3 (W.D.N.C. Jan. 30, 2020) ("An accurate and logical bridge must consider both favorable and unfavorable evidence"). This not only misrepresents the available evidence but frustrates meaningful review, as the ALJ acknowledges Claimant's difficulties in leaving his home, (R. 23), but then does not explain how Claimant would be able maintain full time employment outside of it.

As the Fourth Circuit held in *Shelley C. v. Comm'r of the SSA*, subjective statements from claimants "should be treated as evidence *substantiating* the claimant's impairment." 61 F.4th 341, 360 (4th Cir. 2023) (citing *Arakas v. Comm'r of the SSA*, 983 F.3d 83, 97–98 (4th Cir. 2020)). This means that Claimant is entitled to solely rely on subjective statements to support his mental-health-related claims, and if the ALJ disregarded Claimant's testimony that he rarely leaves his home due to anxiety—which does not appear to be the case—he should have explained why he did so, without simply citing a lack of objective medical evidence or the cherrypicked medical records previously discussed. *Id.* at 361–62. The inconsistency alone requires remand, as the court is unable to trace the ALJ's path of reasoning. *See Mascio*, 780 F.3d at 636. However, the omission is especially troubling because in *Shelley C.*, the Fourth Circuit stated, in pertinent part,

12

> Strikingly, . . . the ALJ disregarded a powerful segment of the vocational expert's testimony. When asked about a person with psychological impairments who would be off task from their job for more than an hour a day, in addition to regular breaks, and miss more than two days of work a month on a regular basis, the vocational expert vocalized that there were no such jobs in the national economy suitable for a person with such limitations. We are perplexed by the ALJ's dismissal of this significant testimony. Given Shelley C.'s daily routine, she cannot possibly be expected to attend, let alone perform, the jobs suggested.

*Shelley C.*, 61 F.4th at 368.

In the instant case, Claimant's potential time off-task and absenteeism are likewise outcome-determinative for two reasons. First, at the July 2023 hearing, the VE testified that being off-task for ten percent or more of the eight-hour workday or missing two or more days of work per month would lead to termination of employment. (R. 60). Second, at step five of the disability analysis, the ALJ identified two jobs that Claimant can perform given his age, education, work experience, and RFC: rack loader and box bender. (R. 28–29). In assessing Claimant's RFC, the ALJ noted that "[a]lthough [a] time off-task provision and absenteeism is not supported by the record, even if the claimant has these additional limitations, he would still be capable of performing [these jobs]." (R. 29). However, without reweighing the evidence, the VE's hearing testimony clearly indicates that showing up to work is a minimum requirement for sustaining competitive employment, and each job identified by the ALJ is an in-person position. Thus, the ALJ's decision should have at least mentioned Claimant's potential time off-task or absenteeism because both are likely to be impacted by Claimant's difficulty leaving his home. *See Shelley C.*, 61 F.4th at 368. The decision addresses neither factor, though, frustrating meaningful review. And as it is not the province of the court to weigh the evidence in the first instance, *see Mascio*, 780 F.3d at 636, remand is warranted for further consideration of this issue.

The conclusion that remand is appropriate is cemented by the impact that the ALJ's

13

omissions had on his assessment of Claimant's adaptation and self-management RFC limitations. The ability to adapt or manage oneself "refers to the abilities to regulate emotions, control behavior, and maintain well-being in a work setting." 20 C.F.R. § pt. 404, subpt. P, app. 1, Listing 12.00E(4). Examples of such abilities include: "[r]esponding to demands; adapting to changes; managing your psychologically based symptoms; distinguishing between acceptable and unacceptable work performance; setting realistic goals; making plans for yourself independently of others; maintaining personal hygiene and attire appropriate to a work setting; and being aware of normal hazards and taking appropriate precautions." *Id.*

In the instant case, the ALJ determined that Claimant's ability to adapt and manage himself is moderately limited, and in support of this finding stated the following:

> He reports that he does not handle stress or changes in routine well. Ex. B4E/7. Nonetheless, he is able to live in his own apartment and has sufficient ability to care for most of his own daily needs and activities of daily living. B11F/42, 50, 69; B12F/9; B13F/69; *see* testimony of Dr. Graham. He has presented on examination with unremarkable behavior and intact judgment. Ex. B11F/49-50, 54, 59, 64, 68-69.

(R. 21). As briefly mentioned *supra*, Claimant contends that despite assessing moderate limitations in Claimant's ability to adapt and manage himself, the ALJ failed to adequately translate these limitations into the RFC. Pl.'s Br. [DE-11] at 5–9. Specifically, Claimant argues that "the ALJ's decision inadequately explains how Plaintiff would be able to function in a competitive employment setting while needing the time off-task to manage his stress before it became a panic attack." *Id.* at 8. Instead, the "RFC is flawed as it makes no account for a moderate limitation in one's ability to adapt or manage oneself." *Id.* at 6.

Claimant's assertion that the RFC makes *no* account for his limitations in this category is plainly belied by the record and by the express language used in the decision. The ALJ's report

14

discusses at length the non-exertional limitations assessed by State agency consultants Drs. Brooke Hansen and Vigita Reddy, the non-exertional limitations assessed in a prior ALJ hearing decision dated March 19, 2020, Dr. Graham's hearing testimony, and the April 2023 letter from Amirah Saintyl, MS, MSW, LCSWA, and the ALJ ultimately assessed an RFC that, *inter alia*, limits Claimant to work in a low-stress environment involving simple, work-related decisions, and having only occasional changes in the work setting. (R. 22, 25–27). This RFC considers Claimant's ability to regulate his emotions, control his behavior, and maintain his well-being in a work setting, i.e., it does consider Claimant's moderate limitations in adapting and managing himself. *See* 20 C.F.R. § pt. 404, subpt. P, app. 1, Listing 12.00E(4). However, because the ALJ did not appropriately evaluate Claimant's subjective statements and cherrypicked the record to support a finding that his mental symptoms have improved more than the evidence actually suggests, it is far from clear whether the assessed RFC is appropriate when balanced against the full weight of Claimant's existing mental impairments. For this reason, the court should remand this matter so that the ALJ can either reevaluate Claimant's non-exertional limitations in light of Claimant's subjective statements, or as explained above, explain why his subjective complaints are not credible. *See Shelley C.*, 61 F.4th at 361–62.

## VI. CONCLUSION

For the reasons stated above, it is RECOMMENDED that the final decision of the Commissioner be reversed and the matter be remanded for further proceedings.

IT IS DIRECTED that a copy of this Memorandum and Recommendation be served on each of the parties or, if represented, their counsel. Each party shall have until **April 21, 2025** to file written objections to the Memorandum and Recommendation. The presiding district judge must conduct his or her own review (that is, make a de novo determination) of those portions of

the Memorandum and Recommendation to which objection is properly made and may accept, reject, or modify the determinations in the Memorandum and Recommendation; receive further evidence; or return the matter to the magistrate judge with instructions. *See, e.g.*, 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3); Local Civ. R. 1.1 (permitting modification of deadlines specified in local rules), 72.4(b), E.D.N.C. Any response to objections shall be filed by within **14 days** of the filing of the objections.

**If a party does not file written objections to the Memorandum and Recommendation by the foregoing deadline, the party will be giving up the right to review of the Memorandum and Recommendation by the presiding district judge as described above, and the presiding district judge may enter an order or judgment based on the Memorandum and Recommendation without such review. In addition, the party's failure to file written objections by the foregoing deadline will bar the party from appealing to the Court of Appeals from an order or judgment of the presiding district judge based on the Memorandum and Recommendation.** *See Wright v. Collins*, **766 F.2d 841, 846-47 (4th Cir. 1985).**

Submitted, this the __7__ day of April, 2025.

Robert B. Jones, Jr.
United States Magistrate Judge

16